Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
August 03, 2022

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * *

| | | |
|---|---|---|
| In re: | ) | Case No. 21-10230-mkn |
| | ) | |
| ELIZABETH ANN RAMSEY, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| EUGENE TUMBARELLO, and | ) | Adv. Proc. No. 21-01039-mkn |
| SHAMROCK PAINTING INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Date:   April 25 and 26, 2022 |
| | ) | Time:  9:30 a.m. |
| ELIZABETH ANN RAMSEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM DECISION AFTER TRIAL[1]**

On April 25 and 26, 2022, a trial was conducted in the above-captioned adversary

proceeding.  The appearances of counsel were noted on the record.  After conclusion of the trial,

---

[1] In this Memorandum Decision, all references to "ECF No." are to the number assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the clerk of court.  All references to "AECF No." are to the documents filed in the above-captioned adversary proceeding.  All references to "Section" or "§§" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All references to "Bankruptcy Rule" are to the provisions of the Federal Rules of Bankruptcy Procedure.  All references to "Civil Rule" are to the Federal Rules of Civil Procedure.  All references to "FRE" are to the Federal Rules of Evidence.

the court directed simultaneous written post-trial briefs be filed by no later than May 13, 2022, at which time the matter would be deemed under submission. This Memorandum Decision constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Civil Rule 52.

**PROCEDURAL BACKGROUND**[2]

On January 19, 2021, Elizabeth Ann Ramsey ("Debtor") filed a voluntary Chapter 7 petition. (ECF No. 1). On the same date, a notice of bankruptcy was issued setting forth a deadline of April 12, 2021, for interested parties to object to the Debtor's Chapter 7 discharge or to object to the discharge of a particular debt.

On March 17, 2021, Eugene Tumbarello and Shamrock Painting Inc. ("Plaintiffs") filed an adversary complaint ("Complaint") seeking a determination that they held a prepetition claim against the Debtor that is nondischargeable under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6). (AECF No. 1).

On April 13, 2021, an Order of Discharge was entered as to all other prepetition claims. (ECF No. 59).

On April 19, 2021, Debtor filed a motion to dismiss asserting that the Complaint fails to state a claim for which relief may be granted ("Dismissal Motion"). (AECF No. 7).

On June 4, 2021, an order was entered denying the Dismissal Motion ("Dismissal Order").[3] (AECF No. 19).

---

[2] Pursuant to FRE 201(b), the court takes judicial notice of all materials appearing on the docket in the above-captioned adversary proceeding and the above-captioned Bankruptcy Case. See U.S. v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980); see also Bank of Am., N.A. v. CD-04, Inc. (In re Owner Mgmt. Serv., LLC Trustee Corps.), 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015) ("The Court may consider the records in this case, the underlying bankruptcy case and public records.").

[3] Section 523(a)(4) denies discharge of debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In response to the Dismissal Motion, Plaintiffs focused on a theory of larceny, rather than embezzlement or fiduciary capacity. See Dismissal Order at 4:10 to 5:12. Pursuit of a theory of embezzlement under Section 523(a)(4) requires the creditor to prove three elements: (1) that property was rightfully in the possession of the debtor, (2) the debtor appropriated the property for a use other than for which it was entrusted, and (3) circumstances indicating fraud. See Ziebarth v. Adams (In re Adams), 833 Fed.Appx. 679, 682

On June 17, 2021, Debtor filed an answer.  (AECF No. 20).

On June 21, 2021, an order was entered in the Chapter 7 proceeding granting Debtor's request for relief from stay.  (ECF No. 61).  Debtor had sought relief from the automatic stay so that she could continue to prosecute an appeal of a non-bankruptcy judgment that had been entered against her prior to the filing of her Chapter 7 petition.  That judgment related to a civil action that the Plaintiffs had commenced on October 23, 2017, against the Debtor and Greg Chambers ("Chambers").  The action was pending in the Eighth Judicial District Court, Clark County, Nevada ("State Court"), and denominated Case No. A-17-763560-C ("State Court Action").  Because of the relief from stay order, Debtor was able to continue pursuit of her appeals of certain orders entered by the State Court, including a judgment denying her claim to a Nevada homestead exemption.

On June 21, 2021, a separate order was entered in the Chapter 7 proceeding sustaining the Plaintiffs' objection to the Debtor's claim of a Nevada homestead exemption ("Exemption Order").  (ECF No. 63).[4]

On January 28, 2022, an order was entered in the instant adversary proceeding setting pretrial conference and trial dates.  (AECF No. 28).

On March 23, 2022, Plaintiffs filed a copy of their subpoena to compel the trial attendance of Todd Geib ("Geib").  (AECF No. 31).[5]

On April 5, 2022, Plaintiff filed ADT declarations for Eugene Tumbarello, Geib ("Geib ADT Declaration"), Sherri Tumbarello ("Sherri ADT Declaration"), Patricia Hayden, and Tom Thomas ("Thomas ADT Declaration").  (AECF Nos. 32, 33, 34, 35, and 36).

---

(9th Cir. 2020), citing Transamerica Commercial Finance Corp v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991).  As discussed below, Plaintiffs now focus on a theory of misconduct while acting in a fiduciary capacity.

[4] Because the State Court previously had determined that the Debtor is not entitled to claim the Nevada homestead exemption, the court was barred by the "Rooker-Feldman doctrine" from reviewing the State Court's decision on a state law matter.  See Exemption Order at 10:6-13 & n.10.

[5] No other individuals listed as potential witnesses were subpoenaed to testify.

On April 5, 2022, Debtors filed ADT declarations from Elizabeth Ann Ramsey and Chambers[6] ("Chambers ADT Declaration").  (AECF Nos. 37 and 38).

On April 6, 2022, Plaintiffs filed an amended Geib ADT Declaration.  (AECF No. 40).

On April 11, 2022, Debtors filed a Trial Statement.  (AECF No. 41).

On April 11, 2022, Plaintiffs filed a Pretrial Statement ("Plaintiffs Pretrial Statement") and separate list of witnesses and exhibits.  (AECF Nos. 42 and 43).

On April 14, 2022, Plaintiffs filed amended ADT declarations for Eugene Tumbarello, Sherri Tumbarello, Tom Thomas, and Patricia Hayden.  (AECF Nos. 45, 46, 47, and 48).

On April 14, 2022, Debtor filed a list of witnesses and exhibits.  (AECF No. 49).

On April 21, 2022, Plaintiffs filed a trial brief ("Plaintiffs Trial Brief").  (AECF No. 50).

On April 25 and 26, 2022, trial was conducted at which Eugene Tumbarello, Todd Geib, Patricia Hayden, and Elizabeth Ramsey testified on cross-examination and re-direct.  At the conclusion of the trial, the evidentiary record closed, and counsel were directed to file post-trial closing briefs after which the matter would be taken under submission.

On May 13, 2022, Debtor filed her post-trial brief ("Debtor Closing Brief").  (AECF No. 54).

On May 18, 2022, Plaintiffs filed their amended post-trial brief ("Plaintiffs Closing Brief").  (AECF No. 56).

## ELEMENTS OF PLAINTIFFS' CLAIMS FOR RELIEF

The Complaint is pled as three separate claims under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).  The burden of proof on all three claims rests with the Plaintiffs.  See In re Faulkiner, 594 B.R. 426, 434 (Bankr. D. Nev. 2018).  Plaintiffs must demonstrate by preponderance of the evidence that each of the required elements of their claims are present.  See Grogan v. Garner, 498 U.S. 279, 291 (1991).

---

[6] Chambers filed a separate Chapter 7 proceeding denominated Case No. 20-12895-MKN.  Therein, Plaintiffs commenced a separate action against Chambers denominated Adversary Proceeding No. 20-01119-MKN, asserting claims to determine dischargeability of debt under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6), and to deny Chapter 7 discharge under Section 727.

**A.  Section 523(a)(2)(A).**

Under Section 523(a)(2)(A), a Chapter 7 discharge does not include a debt "for money, property, services, or an extension … of credit, to the extent <u>obtained by false pretenses, false representations, or actual fraud</u>, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. §523(a)(2)(A) (emphasis added).

In order to establish a claim for actual fraud under Section 523(a)(2)(A),  the plaintiff generally must prove: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." <u>Turtle Rock Meadows, etc. v. Slyman (In re Slyman)</u>, 234 F.3d 1081, 1085 (9th Cir. 2000); <u>Sachan v. Huh (In re Huh)</u>, 506 B.R. 257, 262 (B.A.P. 9th Cir. 2014).  <u>See</u> <u>Wickam v. Ivar (In re Werner)</u>, 817 Fed. Appx. 432, 435 (9th Cir. 2020); <u>see also</u> <u>Ghomeshi v. Sabban (In re Sabban)</u>, 600 F.3d 1219, 1222 (9th Cir. 2010).  The "intent to defraud is a question of fact," and the "intent to deceive can be inferred from the surrounding circumstances."  <u>Cowen v. Kennedy (In re Kennedy)</u>, 108 F.3d 1015, 1018 (9th Cir. 1997), <u>as amended</u> (Mar. 21, 1997).

Because a debtor's circumstances may change, proof of the debtor's intention to deceive <u>at the time the debt was incurred</u> is critical to any finding that a debtor <u>obtained</u> money or credit through fraud.  <u>See</u> <u>In re Faulkiner</u>, 594 B.R. at 439.  <u>See also</u> <u>Chou v. Brody (In re Brody)</u>, 2017 WL 992408, at *6 (B.A.P. 9th Cir. Mar. 15, 2017)("Moreover, the debtor's lack of intent to perform must exist at the time he entered the contract."); <u>Fiebelkorn v. Cooke</u>, 2020 WL 3256805, at *11 (Bankr. D. Ariz. June 15, 2020)(there is "the widely accepted rule that, '[i]n order to establish that a debtor knowingly acted with intent to deceive, it must be shown that **at the time the debt was incurred**, the debtor never had any intention of repaying the obligation in full.'")(emphasis in original).

A debt for actual fraud that is nondischargeable under Section 523(a)(2)(A) also can include a fraudulent conveyance scheme that is not effectuated through false representations. Actual fraud includes actions involving moral turpitude, intentional wrong, deception, or

trickery. Thus, a debtor who is the recipient of a fraudulent transfer and therefore participates in a fraudulent transfer scheme may be subject to a nondischargeable claim for actual fraud under 523(a)(2)(A) without having made any representations or omissions to the creditor. See Husky International Electronics, Inc. v. Ritz, 136 S.Ct. 1581 (2016) (523(a)(2)(A) encompasses forms of fraud that do not include a false representation).

**B. Section 523(a)(4).**

By its terms, Section 523(a)(4) addresses debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." As a threshold matter, a creditor pursuing a claim based on misconduct in a fiduciary capacity must demonstrate that a fiduciary relationship existed and that the debtor committed fraud in that capacity. See In re Zimmerman, 2011 WL 1753779, at *4 (Bankr. D. Ariz. May 6, 2011). A fiduciary relationship must be established by an express trust or by a technical trust. See Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996). Nevada law may impose fiduciary duties among members of a joint venture. See Brinkerhoff v. Foote, 132 Nev. 950, 2016 WL 7439357, at *4 Nev. (2016).[7]

**C. Section 523(a)(6).**

Under Section 523(a)(6), the creditor must separately plead and establish both a willful injury and malicious injury. See Carroll v. Bohrer (In re Bohrer), 2021 WL 1915991, at *10 (Bankr. S.D. Cal. Apr. 27, 2021). A willful injury exists "only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." Delannoy v. Woodlawn Colonial, L.P. (In re Delannoy), 615 B.R. 572,

---

[7] Although the second claim for relief in the Complaint was identified as being for "Conversion/Larceny pursuant to 11 U.S.C. § 523(a)(4)," see Complaint at 11:13-14, Plaintiffs have never specified whether conversion or larceny is the actual basis for their claim. See Dismissal Order at 4:10 to 5:12. In their Pretrial Statement, Plaintiffs offered nothing more than that the Complaint "is brought pursuant to 11 USC § 523(a)(2), (4), & 6." See Plaintiffs' Pretrial Statement at 3:15-16. In their Trial Brief, Plaintiffs simply parrot the language of these statutory provisions. See Plaintiffs Trial Brief at 4:18 to 5:7; 6:11-16. In their post-trial argument, however, Plaintiffs abandon all discussion of larceny or embezzlement, and argue that the Debtor engaged in fraud or defalcation while acting in a fiduciary capacity. See Plaintiffs Closing Brief at 6:4 to 8:8. At no time have the Plaintiffs sought to amend the Complaint according to proof under Civil Rule 15(b)(2).

584 (B.A.P. 9th Cir. 2020), aff'd, 2021 WL 1923744 (9th Cir. May 13, 2021), quoting Carillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002). The malicious injury requirement is met by demonstrating that the injury "involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause and excuse." Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1209 (9th Cir. 2001). See, e.g., White v. Skupa (In re Skupa), 2021 WL 1521508, at *3 (Bankr. D. Alaska Apr. 14, 2021) (granting summary judgment on both elements under 523(a)(6)).

### THE EVIDENTIARY RECORD

At the trial, four witnesses were cross-examined concerning their ADT declarations. Forty-one exhibits were admitted into evidence.

**A. The Witnesses**

Four witnesses were cross-examined concerning the testimony set forth in their ADT declarations.[8]

**1. Todd Geib (Geib)**

Geib is a real estate agent who is a long-time acquaintance of both Tumbarello and Chambers. Geib represented the Plaintiffs in negotiating separate transactions to renovate two adjacent residential properties in Las Vegas, Nevada, located at 1207 Westlund Drive ("1207 Westlund") and 1201 Westlund Drive ("1201 Westlund"). The transactions apparently were memorialized in agreements dated October 20, 2016 ("1207 Westlund Agreement") and March 3, 2017 ("1201 Westlund Agreement").

**2. Eugene Tumbarello ("Tumbarello")**

Tumbarello is or was the principal of Shamrock Painting, Inc. Geib introduced Tumbarello to Chambers.

**3. Patricia Hayden ("Hayden")**

Hayden is or was the office manager and bookkeeper of Shamrock Painting.

**4. Elizabeth Ramsey (Debtor)**

---

[8] Sherri Tumbarello, Tom Thomas, and Gregg Chambers were not called to testify and the Sherri ADT Declaration, Thomas ADT Declaration, and Chambers ADT Declaration were not offered or admitted into evidence.

Debtor is or was Chambers' fiancé and resides in the 1201 Westlund property.

**B. The Exhibits[9]**

Plaintiffs' Exhibits 1, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26 27, 28, 29, 30, 31, 32, 36, 37, 38, 40, 41, 42, 53, and 54 were admitted into evidence. Debtor's Exhibits A, B, C, D, E, and F were admitted into evidence.

## DISCUSSION

The 1207 Westlund Agreement is a one-page document dated October 20, 2016.  (Exhibit 6)  The agreement refers to the Debtor as "(Owner)" and to Chambers as "(Owner/Contractor)." Title to the real property was acquired by the Debtor on September 30, 2016.  (Exhibit A).  The agreement apparently provides for the Plaintiffs to contribute $50,000 in funds and materials for estimated renovation costs, for the property to eventually be sold for between $394,000 and $412,000, and for Plaintiffs to receive 30% of the net profits.

The 1201 Westlund Agreement also is a one-page document dated March 3, 2017. (Exhibit 1).  The agreement also refers to the Debtor as "(Owner)" and to Chambers as "(Owner/Contractor)."  Title to the real property was acquired by the Debtor on March 30, 2017. (Exhibit C).  The agreement provides for the Plaintiffs to contribute funds and materials for renovation costs, for the property to be sold for between $402,000 and $412,800, and for Plaintiffs to receive 50% of the net profits.  The 1201 Westlund Agreement includes language suggesting that the Plaintiffs would provide $78,000 for the down payment to acquire the property and that there would be $30,000 in "rehab" costs.

There is no dispute that Tumbarello never met the Debtor at any time before the formation of the 1207 Westlund Agreement nor the 1201 Westlund Agreement.  There is no dispute that the signatures appearing on the 1207 Westlund Agreement and 1201 Westlund Agreement were notarized, if at all, only for Tumbarello.

There is no dispute that on October 23, 2017, the Plaintiffs commenced the State Court Action asserting a variety of legal theories, including deceit, misrepresentation, civil conspiracy,

---

[9] Because Plaintiffs' exhibits are marked only by numbers, and Debtor's exhibits are only marked by letters, the specific document will be referenced hereafter simply as "Exhibit(s)" and also may include additional identifying information.

unjust enrichment,[10] and breach of the 1207 Westlund Agreement and the 1201 Westlund Agreement.  There is no dispute that the Debtor defaulted by not responding timely to Plaintiffs' Complaint and that she was unsuccessful in convincing the State Court to set aside the default. There is no dispute that the Debtor and Chambers appealed decisions of the State Court, including the decision denying Debtor's request to set aside the default.

There is no dispute that on August 15, 2018, a settlement was reached between the Plaintiffs, the Debtor and Chambers to resolve the State Court Action including the pending appeals, as reflected in a Memorandum of Understanding.  There is no dispute that both Tumbarello and the Debtor attended the settlement conference that resulted in the Memorandum of Understanding.[11]  There is no dispute that the Debtor and Chambers signed the Memorandum of Understanding.

There is no dispute that both the Debtor and Chambers did not meet the obligations set forth in the Memorandum of Understanding.  There is no dispute that the Plaintiffs then requested the State Court to enforce the settlement and that the State Court entered judgments permitting the Plaintiffs to execute on the 1207 Westlund Property as well as the 1201 Westlund Property.  There is no dispute that both properties were acquired by the Plaintiffs through a sheriff's sale and that the Debtor thereafter redeemed her interest in the 1201 Westlund Property. There is no dispute that in subsequent proceedings Debtor claimed a Nevada homestead in the 1201 Westlund Property that was rejected by the State Court.  There is no dispute that the Debtor appealed the decision rejecting her homestead claim.  There is no dispute that Debtor's appeal remains pending before the Nevada Supreme Court.

There is no dispute that no written agreement exists between the Plaintiffs, the Debtor

---

[10] Under Nevada law, a claim for unjust enrichment requires the plaintiff to establish that the defendant accepted and received a benefit "under circumstances where it would be inequitable for him to retain the benefit without payment of the value thereof."  Certified Fire Protection, Inc. v. Precision Construction, 283 P.3d 250, 257 (Nev. 2012).  See also Korte Construction Co. v. Board of Regents of Nevada Sys. of Higher Educ., 492 P.3d 540, 543 (Nev. 2021).

[11] Debtor testified that while both she and Tumbarello attended the settlement conference, they never met because the parties were kept in separate rooms.

and Chambers, other than the alleged 1207 Westlund Agreement, 1201 Westlund Agreement, and Memorandum of Understanding.  There is no dispute that no written partnership, joint venture, agency, or similar agreement between the Debtor and Chambers has been suggested or offered into evidence.

### A. Section 523(a)(2)(A).

Plaintiffs' legal theory is that the Debtor was in a joint venture with Chambers and that the fraudulent acts of Chambers are imputed to the Debtor.[12]  See Plaintiffs Closing Brief at 6:3 to 9:2.[13]  Those fraudulent acts included Chambers' misrepresentations in the creation of the 1207 Westlund Agreement and 1201 Westlund Agreement, his misuse of Plaintiffs' funds in performing the agreements, and his refusal to permit the sale of the properties as contemplated by the agreement.  Because Plaintiffs' theory is dependent on the existence of a joint venture between the Debtor and Chambers, the court must examine whether Plaintiffs have met their burden of proving the existence of a joint venture.

Plaintiffs maintain that the Debtor is bound by the 1207 Westlund Agreement and 1201 Westlund Agreement because both include her signature.[14]  Plaintiffs maintain that the Debtor previously admitted to signing the 1201 Westlund Agreement when she filed a declaration under penalty of perjury in connection with the State Court Action.  (Exhibit 38).  At trial, however, Debtor testified that she did not sign either agreement, and that the declaration she filed in the

---

[12] Although the fraudulent acts of a spouse may be imputed under Section 523(a)(2)(A) to the other spouse who benefited from the fraudulent acts, see Buckley v. Bartenwerfer (In re Bartenwerfer), 860 Fed.Appx. 544 (9th Cir. 2021), the Debtor apparently is or was Chambers' fiancé but they are not married.

[13] As discussed at note 7, supra, in their Pretrial Statement and Trial Statement, Plaintiffs simply state that they are proceeding under Sections 523(a)(2), (4) and (6), without detailing any specific factual bases for such claims.

[14] Both documents do not appear to have been drafted with any legal assistance and do not express whether any party would have an "equity interest" in the properties.  Moreover, neither document specifies the authority of any signatory to bind another signatory to their activities or conduct in furtherance of the agreements.

State Court Action was signed in error.[15]  The court has compared the signatures appearing on both the 1207 Westlund Agreement and the 1201 Westlund Agreement with other documents admitted into evidence.  Compare Exhibits 1 at PLTF0003, 6 at PLTF0002, and 38 at PLTF001777, with Exhibits 15 at PLTF0236 and PLTF0237, 17, 22, 24 at PLTF0394, 38 at PLTF001774, PLTF001781 and PLTF001786, 40 at PLTF001809, and 42 at PLTF001828.  Use of the nickname "Beth" on the signature lines for the two agreements is inconsistent with the full name "Elizabeth" or "ERamsey" appearing on the signature lines for other documents that the parties do not dispute were signed by the Debtor.[16]  Moreover, the cursive used on the respective signature lines also do not resemble one another.  Instead, it appears that some other person signed the 1207 Westlund Agreement and the 1201 Westlund Agreement but not the Debtor.  Additionally, Debtor testified that she had no recollection of ever authorizing Chambers to sign

---

[15] That document was prepared by the counsel representing both the Debtor and Chambers in the State Court Action.  It is entitled "Declaration in Lieu of Affidavit of ELIZABETH RAMSEY."  (Exhibit 38 at PLTF001774).  It is preceded by a similar document entitled "Declaration in Lieu of Affidavit of GREGG CHAMBERS."  (Exhibit 38 at PLTF001773).  In paragraph 3 of both documents, the declarants state with reference to the 1201 Westlund Agreement that "we executed the agreement on March 3, 2017."  At trial, however, Debtor testified that before she had a chance to fully review the document, her counsel in the State Court Action hurriedly asked her to sign the declaration on February 12, 2018, in order to meet a pressing State Court deadline to set aside her default on the Plaintiffs' complaint.  Attached to the document are several exhibits (Exhibit 38 at PLTF001775 – PLTF001789).  Those exhibits include copies of the 1201 Westlund Agreement, a bank statement for Chambers acknowledging receipt of a $48,000 wire transfer on March 27, 2017, and an escrow settlement statement indicating a down payment amount of $74,076.48 was required to complete the purchase of the 1201 Westlund property.  Debtor testified that she would never have signed the declaration prepared by her State Court counsel if she had time to read the document as well as the copy of the 1201 Westlund Agreement attached to it.  The court finds the Debtor's testimony on this issue to be credible.

[16] Indeed, the signature appearing on the declaration filed in the State Court Action (Exhibit 38 at PLTF001774) does not appear to match the signatures appearing on the 1207 Westlund Agreement and 1201 Westlund Agreement.  These discrepancies appear in the very documents offered by the Plaintiffs and admitted into evidence.  In response to Plaintiffs' prior discovery, Debtor verified on December 2, 2021, that she did not sign either agreement.  See Exhibit 40, Request for Admission Nos. 12 and 13; Exhibit 42, Interrogatory No. 12.  Between the time the discovery responses were provided and the commencement of trial, neither party appears to have retained a handwriting expert to verify the signatures appearing on any of the documents admitted into evidence.

the 1201 Westland Agreement and she offered no testimony that anyone else was authorized to sign the agreement on her behalf.  Debtor verified in her discovery responses and testified at trial that she did not sign the 1207 Westlund Agreement or the 1201 Westlund Agreement.  Based on the evidence presented, the court finds her testimony in this regard to be credible.[17]

Debtor also testified that she does not have a written joint venture, partnership, or other business agreement with Chambers.  No written agreement between the Debtor and Chambers was offered into evidence by the Plaintiffs.  Debtor testified that she has no business relationship with Chambers and has no personal knowledge of Chambers' business activities with the Plaintiffs.[18]  Moreover, Chambers was never called to testify and he was never subpoenaed to testify.  None of the exhibits bearing Chambers' signature and admitted into evidence provide testimony from Chambers that he had a joint venture, partnership, or other business agreement, written or unwritten, with the Debtor.  In other words, there is no written evidence establishing that the Debtor had a joint venture or similar relationship with Chambers.

Absent any written agreement between the Plaintiffs and the Debtor, or any written agreement between the Debtor and Chambers, the court examines whether the Plaintiffs have met their burden of proving that a joint venture encompassing the Debtor otherwise existed in this case.

As previously discussed, Debtor obtained title to the 1207 Westlund Property on or about September 30, 2016, and the 1207 Agreement is dated October 20, 2016.  By contrast, the 1201 Westlund Agreement is dated March 3, 2017, and the Debtor obtained title to the 1201 Westlund Property on or about March 30, 2017.  In other words, there is no suggestion that Plaintiffs provided funds for the Debtor to acquire the 1207 Westlund Property, while the Plaintiffs do suggest that they provided funds for the Debtor to acquire the 1201 Westlund Property.

---

[17] Debtor also testified that the signature on the 1201 Westlund Agreement appears to be close to that of Chambers, but she cannot verify that it is.

[18] As previously discussed at note 6, supra, the Plaintiffs commenced a separate adversary proceeding against Chambers under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) and Section 727.  Given the Debtor's testimony under oath in the present matter, she presumably will have little ability to corroborate or contradict any testimony offered by Chambers in the other adversary proceeding.

Between November 7, 2016 and September 29, 2017, numerous vendor invoices and cash register receipts evidence that purchases were made using the Plaintiffs' accounts for various renovation materials.  See Exhibits 9 (Home Depot – 11-7-2016 to 9-29-2017),[19] 10 (Home Depot – 11-12-2016 to 8-10-2017), 11 (Home Depot – 11-29-2016 to 8-19-2017), 12 (Sherwin-Williams – 1-6-2017 to 2-28-2017), and 13 (Sherwin-Williams – 3-23-2017 to 5-5-2017).[20]  Prior to the commencement of the State Court Action, offers and counteroffers were exchanged between a third party and the Debtor to purchase and sell the 1207 Westlund Property.  (Exhibit 15).

After the State Court Action was commenced on October 23, 2017, there were no additional purchases using Plaintiffs' vendor accounts and apparently no more attempts to sell the properties.[21]  In early November 2017, Tumbarello allegedly had a conversation with the Debtor or Chambers that was reported to Geib.  (Exhibit 17).  Presumably, that conversation would have occurred, if at all, between Tumbarello and Chambers inasmuch as both Tumbarello and the Debtor confirm that they never had contact with one another.  In late November 2017, Tumbarello apparently transmitted an email to the Debtor dated November 27, 2017, that was in response to an alleged email from the Debtor dated November 25, 2017.  (Exhibit 18).  In his November 27, 2017 email, Tumbarello confirms that he had a prior telephone conversation with

---

[19] Exhibit 9 includes a Sherwin-Williams invoice having a transaction date of 7/17/17 (PLTF0153).

[20] Although some of the invoices include expletives apparently handwritten by a skeptical representative of the Plaintiffs, none of the invoices indicate the Debtor's knowledge of or involvement in any of the purchases.  Most of the invoices specifically indicate that the purchases were made by Chambers and some specifically indicate purchases by Geib, but none of the invoices mention or refer to the Debtor.

[21] Based on judgments entered in the State Court Action, both properties were later sold at sheriff's execution sales that occurred on August 8, 2019.  See Exhibit 26 (1207 Westlund Property) and  Exhibit 27 (1201 Westlund Property).  Thereafter, Debtor redeemed the 1201 Westlund Property from the sheriff's execution sale and again has claimed a homestead in the residence under Nevada law.  The State Court Denied her homestead claim and the Debtor has appealed that decision.  Because the bankruptcy court has no authority to review the merits of the State Court's prior determination, this court has sustained the Plaintiffs' objection to the Debtor's claim of a Nevada homestead exemption in this Chapter 7 proceeding.

Chambers.[22] After describing his conversation with Chambers and other interactions with Chambers, Tumbarello writes: "I believe there has been loan fraud on your loans since you probably said you were going to purchase them as a private residence <u>when I have an agreement signed and recorded by you stating otherwise</u>…" (Emphasis added.) Exhibit 18 does not include, however, any of the contents of the alleged November 25, 2017 email from the Debtor. Additionally, the penultimate paragraph of Tumbarello's November 27, 2017 email also states: "I have spoken to 3 different attorneys and they all feel as the court would see we have a binding contract which you have not lived up to. <u>Should we have to go to court</u> I am seeking attorney fees and all expenses. I hope we can work this out soon otherwise I will be seeking punitive damages as well which is in order." (Emphasis added.) Thus, notwithstanding Tumbarello's bizarre threat to file a lawsuit when he already had done so, and to seek attorney's fees and punitive damages that already were sought in his State Court Action, there is no evidence of an acknowledgement or admission by the Debtor that a joint venture or similar arrangement existed between any of the parties. Moreover, Tumbarello's accusation that the Debtor engaged in fraudulent conduct that was inconsistent with the 1201 Westlund Agreement assumes that the document actually was signed by the Debtor.[23] As already discussed, the court disagrees with that assumption and instead finds that the Plaintiffs have failed to prove that the 1207 Westlund Agreement and 1201 Westlund Agreement were signed by the Debtor.

After the alleged email exchanges between Tumbarello and the Debtor in late November 2017, various activities took place in the pre-existing State Court Action. Those activities included the entry of default judgments against both the Debtor and Chambers that were subsequently appealed. Tumbarello and the Debtor agree that the first time they could have met

---

[22] It also suggests that Exhibit 17 had been transmitted to him by the Debtor's November 25, 2017, email.

[23] Debtor testified that she has no record of transmitting an email to Tumbarello on November 25, 2017, and that she had no reason to do so. She also testified that she has no record of receiving the email from Tumbarello on November 27, 2017, and responded accordingly when asked to produce documents. (Exhibit 41). Debtor testified that she is the only person who has access to her email account.

14

was at the appellate settlement conference that took place on or about August 15, 2018. Debtor testified, however, that Tumbarello was in a separate room during the settlement conference and they never actually met. That settlement conference resulted in the Memorandum of Understanding. (Exhibit 22).

The Memorandum of Understanding was signed by the Debtor, Chambers and Tumbarello. Neither the Debtor nor Tumbarello dispute that they signed the document. Nothing in the document, however, acknowledges, concedes, admits, or indicates in any way that a joint venture or similar arrangement existed between or among any of the parties. Because the document resolved pending litigation, no such acknowledgement, concession, admission, or indication was required. In other words, the Memorandum of Understanding also does not support the Plaintiffs' legal theory that a joint venture was created by which the Debtor could be liable for the alleged activities of Chambers.

At trial, Tumbarello testified that the Plaintiffs had not obtained or reviewed any financial statements, tax returns, bank statement, or references from the Debtor. He also testified that the Plaintiffs had not provided the Debtor with any money in the form of cash, checks, money orders, or wire transfers. Other than the alleged November 2017 emails, Tumbarello testified that he had never spoken or communicated with the Debtor prior to the appellate settlement conference, if at all. He testified that based on his communications with Chambers, he believed that Chambers was acting as the Debtor's agent.[24] Tumbarello testified that he relied on Geib and believes that Geib prepared the 1207 Westlund Agreement and 1201 Westlund Agreement. He also testified that when he signed the 1201 Agreement that had been sent to him by Geib, the

---

[24] Exhibit 19 contains six pages (PLTF0312 to PLTF0317) consisting of "screen shots" from Tumbarello's cell phone. The screen shots appear to be text messages received by Tumbarello. All of the screen shots bear a capital "G" appearing in a circle. It is unclear whether the "G" represents a text communication from Gregg (Chambers), Geno (Tumbarello), or (Todd) Geib. None of the text messages appear to be from or to the Debtor. PLTF0312, 0313, 0315 and 0316 appear to be messages from Chambers to Tumbarello. PLTF0314 appears to be from Geib to Tumbarello. PLTF0317 appears to be from Tumbarello to Chambers. The messages appear to relate to attempts to settle the State Court Action and to include the Debtor because she was on title to both properties. None of the messages reference or establish Chambers was acting as the Debtor's agent or that a joint venture existed between the Plaintiffs and the Debtor, nor between the Debtor and Chambers.

document already had the signatures of Chambers and the Debtor.  In other words, Tumbarello never had any direct dealings with the Debtor regarding the creation and performance of the 1207 Westlund Agreement or the 1201 Westlund Agreement, and never witnessed the Debtor signing either document.  More important, Tumbarello did not attest that the Debtor expressly authorized Chambers to act as her agent nor that Chambers expressly represented that he was acting as the Debtor's agent.

At trial, Hayden testified that she never had any communications whatsoever with the Debtor and has no personal knowledge of the 1207 Westlund Agreement or the 1201 Westlund Agreement.  She acknowledged that she was not present when either agreement was signed. Hayden notarized Tumbarello's signature on the 1201 Westlund Agreement on March 3, 2017 and thereafter returned it to Geib.  (Exhibit 4).  She testified that  no credit cards, direct payments, money orders, checks, or wire transfers were ever given or made to the Debtor.

At trial, Geib testified that while he introduced Tumbarello and Chambers, he had no knowledge of and no way of knowing of any written agreements between Chambers and the Debtor.  He testified that he had no knowledge of any fictitious name given to any business entity formed by Tumbarello, Chambers and the Debtor, nor of any business addresses, business licenses, or bank accounts.  Geib testified that he had no knowledge of any checks written by the Debtor to the Plaintiffs, nor of any checks from the Plaintiffs deposited into any of the Debtor's bank accounts.  He testified that he is aware only of a Shamrock Painting card for use at Home Depot that was given at one time to Chambers,[25] but no other credit card.[26]  Geib is not aware of any credit card being given to the Debtor.  He is not aware of any "business material" that was

---

[25] Geib testified that purchase receipts from Home Depot were audited by comparison to the invoices received, and some of the purchases by Chambers were disputed.  He testified that some of the purchases on the Home Depot account were for use by Chambers on projects other than the Westlund Properties.

[26] Geib also testified that on two occasions he went to Home Depot with Chambers and the Debtor to purchase materials for the 1207 Westlund Property, but that there was no specific discussion with the Debtor as to the purpose for acquiring the materials to renovate and resell the 1207 Westlund Property.

16

delivered directly to the Debtor.[27]  Geib confirmed that the Debtor purchased the 1207 Westlund Property on September 30, 2016.  He testified that when the Plaintiffs eventually obtained title to the 1207 Westlund Property,[28] substantial defects were discovered in the renovations that were performed by Chambers.  Geib also testified that to his knowledge, Tumbarello had never met the Debtor and Tumbarello had never spoken to the Debtor except possibly at the settlement meeting.  Geib testified that the Debtor never informed him that she was a licensed contractor or that Chambers was a licensed contractor.[29]

Geib testified that he filed the 1207 Westlund Agreement and the 1201 Westlund Agreement with the Clark County Recorder's office.  He testified on redirect that the Debtor executed the agreements, but on cross-examination had no recollection of whether the Debtor signed either document.[30]  Geib testified that he had spoken to the Debtor perhaps 8-12 times over a period of one year, and that the Debtor was present during some of the conversations he had with Chambers about the renovation of the properties.[31]  He testified that he is not aware of any cash given by Tumbarello to the Debtor.[32] Geib testified that he does not recall who prepared

[27] It is not clear whether the term "business material" was referring to supplies used in renovating the properties or written documents related to the subject agreements.

[28] There is no dispute that based on a judgment obtained in the State Court Action, a sheriff's execution sale was conducted on or about August 8, 2019, through which the Plaintiffs obtained title to the 1207 Westlund Property.  (Exhibit 26).

[29] Geib testified that because Chambers' father was a licensed contractor with whom he had dealt in the past, he never inquired about Chambers' status because he assumed that he would be licensed.  He testified, however, that he "figured" Chambers was a licensed contractor by the way Chambers acted.

[30] Geib's conflicting testimony appears to have been the result of Geib simply agreeing with the leading question from Plaintiffs' counsel rather than being asked to state any recollection of specifically witnessing the Debtor sign the document.

[31] Based on Debtor's presence during those conversations, Geib testified that Debtor was aware of the terms of the subject agreements, and was aware of Chambers' representations.  He testified that based on her presence during some of the conversations, he would have thought that the Debtor was aware of how moneys would move in and out of the deal.

[32] Geib testified that Tumbarello provided a check to him dated February 2, 2017, in the amount of $10,000.  (Exhibit 14).  He stated that he converted the check to cash, and thereafter

the agreements.[33]  He testified that the properties were intended to be purchased for renovation and resale rather than for the Debtor or Chambers to occupy as their personal residence.  Geib testified that the transaction was a joint venture between Tumbarello, Chambers and the Debtor to "flip" the properties as soon as possible.[34]  He testified that efforts to sell the 1207 Westlund Property were discontinued after Chambers refused to accept above-market offers to purchase.[35]

Geib testified that Tumbarello provided the down payment for the Debtor to acquire the 1201 Westlund Property.  He acknowledged that the 1201 Westlund Agreement dated March 3, 2017, states that the 1201 Westlund Property described both the Debtor and Chambers as owners of the property.  Geib testified that the Debtor completed the purchase of the 1201 Westlund Property from its prior owners on March 30, 2017.  He clarified that funds described in the 1201 Westlund Agreement as a down payment actually may have been funds contributed by Tumbarello to renovate the 1201 Westlund property rather than for the Debtor to purchase the property.

---

delivered the cash to Chambers without obtaining a receipt.  Geib testified that Chambers was supposed to use the cash to pay laborers for work on the 1207 Westlund Property but that Chambers did not do so.

[33] As previously mentioned, Tumbarello testified that he believed that Geib had prepared the agreements.  Presumably, Tumbarello did not do so because both documents include misspellings of Tumbarello's name.  Chambers represented in the State Court Action that neither he nor the Debtor drafted any of the agreements.  (Exhibit 39 at PLTF001796).  Geib testified that the Debtor had never previously expressed that she had not signed the agreements or disclaimed any joint venture with Tumbarello.  That testimony assumes, of course, that the Debtor was even aware of the two agreements or that her signature appeared on the documents.

[34] Geib repeatedly testified that to the best of his knowledge, the Debtor was aware of the terms of the "joint venture," the responsibility of Chambers to perform the renovations, and the need for a licensed contractor to perform the renovations.

[35] Geib specifically testified that Chambers had control over everything and that the Debtor and Chambers did not act together on every decision; rather, Chambers controlled the situation, handled everything, and the Debtor would sign documents when instructed by Chambers.  He also testified that the Debtor never informed him that he could rely on any decision made by Chambers, but that the Debtor never contradicted any decisions made by Chambers.

At trial, Debtor testified that she never signed either agreement. She also testified that she never saw copies of either agreement until 2020 when Chambers showed her a binder of the materials filed in the State Court Action. Debtor testified that she originally purchased the 1207 Westlund Property with the intention that she would live there with Chambers. She testified that because they planned to live together in the property, they verbally agreed that Chambers would do the remodeling.[36] When asked about the purchases from Home Depot reflected in Exhibit 11, Debtor testified that she was aware that Chambers was using Plaintiffs' account for purchases to renovate the 1207 Westland Property but had no knowledge of any specific purchases. She acknowledged that she accompanied Geib and Chambers to Home Depot in August 2017 to look at kitchen upgrade materials in anticipation of marketing the 1207 Westlund Property, and assumed that any materials later purchased by Geib were actually installed in the property. Debtor conceded that any materials installed at the 1207 Westlund Property provided a benefit to her inasmuch as they improved the property that she owned.[37] She acknowledged that the 1207 Westlund Property was never sold.[38]

---

[36] Debtor testified that she permitted Chambers to remodel the 1207 Westlund Property but had no involvement in how Chambers would fund the remodeling. Additionally, although the 1207 Westlund Property was purchased in her name, Debtor acknowledged that on May 22, 2019, she quitclaimed a 50% interest to Chambers. (Exhibit 24). She testified that Chambers lived at the property at that time, presumably because the Plaintiffs had not obtained title to the 1207 Westlund Property until the August 8, 2019 sheriff's execution sale. Debtor testified that she does not recall why the interest was quitclaimed to Chambers. As previously mentioned in note 5, supra, Chambers was never subpoenaed to testify as to this or any other matters raised at trial.

[37] Debtor only reluctantly conceded at trial that she received a benefit from the improvements on the 1207 Westlund Property. She seemed to imply that the financial benefit received did not outweigh the financial and other costs of the litigation that subsequently ensued. Presumably the Plaintiffs experience a similar remorse for getting involved in financial transactions encompassing her properties.

[38] Debtor acknowledged that in October 2017, offers and counteroffers were exchanged for the purchase and sale of the 1207 Westlund Property, and that Geib was acting as her real estate agent. (Exhibit 15).

Debtor also testified that despite the language in the 1201 Westlund Agreement, Plaintiffs never provided any of the down payment for her purchase of the property.[39]  She testified that the down payment for the purchase of 1201 Westlund came from the $93,096.74 in net proceeds she received from her January 30, 2017 sale of the residence located at 9257 Evergreen Canyon Drive, Las Vegas, Nevada ("Evergreen Canyon Property").  (Exhibit B). Debtor testified that the proceeds from the Evergreen Canyon Property sale were wire transferred on January 31, 2017 to her account at Bank of America.  (Exhibit D at DEF 53).  She testified that the amount of $73,941.18 was wire transferred from the same account on March 30, 2017 as part of the down payment for her purchase of the 1201 Westlund Property.  (Exhibit D at DEF 74).  Debtor testified that she used additional available funds to make up the balance of the down payment.[40]  She testified that she had no knowledge of whether Plaintiffs wire transferred $48,000 to Chambers[41] or provided a check for an additional $30,000 to Chambers (Exhibit 3), but that none of those funds were given to or transferred to the Debtor to make the down payment on the 1201 Westlund Property.[42]

---

[39] Although Geib's testimony was conflicting as to the purpose of the $78,000 provided by the Plaintiffs, both of the declarations filed by Chambers and the Debtor in the State Court Action  (Exhibit 38 at PLTF001773 and PLTF001774) state that the $78,000 from the Plaintiffs was intended to be a down payment for the purchase of the 1201 Westlund Property.  Both declarations state, however, that the declarants raised separate cash to make the down payment after only $48,000 was received by Chambers.

[40] Apparently, the estimated total down payment for the Debtor to purchase the 1201 Westlund Property was $77,125.  (Exhibit 4 at PLTF0202).

[41] Chambers apparently acknowledged receipt of the $48,000 wire transfer from the Plaintiffs.  (Exhibit 38 at PLTF001773).

[42] Exhibit 3 does not indicate the date when $48,000 was wire transferred to Chambers. The $30,000 check payable to Chambers is dated March 11, 2017.  Debtor's Bank of America account statements encompassing the period from January 26, 2017 through April 24, 2017 (Exhibit D at DEF 53 through DEF 76), however, do not reflect any deposits in those amounts from any source.  The largest deposit is the amount of $93,096.74 received by wire transfer on January 30, 2017, from the sale of the Evergreen Canyon Property.  In other words, Debtor's bank statements do not indicate that the funds apparently provided by the Plaintiffs to Chambers were transferred thereafter to the Debtor.  What actually happened to the $48,000 wire transferred to Chambers as well as the funds from the separate $30,000 check written to Chambers is unknown.

The court having concluded that there is no written agreement creating a joint venture or similar relationship between the parties, also concludes that Plaintiffs have failed to demonstrate that a joint venture or similar relationship with the Debtor can be implied from the evidence presented.  The evidence indicates that Tumbarello had little, if anything, to do with the formation of the subject agreements or the performance of the agreements.  He does not even know who drafted the agreements.  Instead, he dealt primarily with Chambers after his introduction by Geib.  Tumbarello admittedly never met the Debtor and even his purported email communication on November 27, 2017, is questionable.  There is no apparent dispute that Tumbarello provided funds that apparently went to Chambers, but there is no evidence indicating that the funds ever went to the Debtor.  In particular, the evidence indicates that the Debtor acquired the 1201 Westlund Property through a down payment using proceeds from her sale of the Evergreen Canyon Property she owned, rather than using any of the funds provided by Tumbarello to Chambers.[43]

Moreover, while the Debtor admits that Chambers' use of the Plaintiffs' Home Depot account benefitted the 1207 Westlund Property, receipt of the benefit itself does not establish that there was ever an agency relationship between Chambers and the Debtor.[44]  None of the

---

[43] No evidence has been offered that the issue was ever actually litigated in the State Court Action.  Debtor defaulted on the State Court complaint and her attempts to set aside the default were rejected by the State Court.  She appealed the State Court orders but the appeals were never decided because the parties reached the settlement reflected in the Memorandum of Understanding.  When the Plaintiffs sought to enforce the Memorandum of Understanding, Debtor claimed an exemption in the 1201 Westlund Property, but the State Court denied the claimed exemption in its July 22, 2019 Order.  See Exemption Order at 4:8-12.  That order never included a ruling that the Debtor had fraudulently obtained funds to purchase the property.  Thereafter, the State Court entered its October 8, 2020 Order which included a finding that it had ruled in its July 22, 2019 Order that a homestead exemption does not apply to an individual using fraudulently obtained funds.  See Exemption Order at 5:14-17 & n.4.  While the finding in the October 8, 2020 Order is not supported by the findings that were made in the July 22, 2019 Order, there is nothing in the record before this court that the source of funds used by the Debtor to acquire the 1201 Westlund Property was ever actually litigated before the State Court.

[44] As previously mentioned at note 10, supra, in absence of an enforceable contract, a claim for unjust enrichment under Nevada law may be brought where the plaintiff confers a benefit appreciated by the defendant under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value.

21

invoices and statements from Home Depot or Sherwin-Williams indicated any involvement by the Debtor in the purchases reflected in those documents.  Other than the Geib's visit to a Home Depot location in August 2017 accompanied by Chambers and the Debtor, no evidence has been admitted that the Debtor had any knowledge of Chambers' particular uses of the Plaintiffs' account.  Tumbarello, Geib, and Hayden corroborate that the Debtor never received funds of any kind, or by any means from the Plaintiffs, nor any credit or account cards of any kind. Tumbarello acknowledged that he never obtained any financial documents or references from or concerning the Debtor before or after entering into the 1207 Westlund Agreement or the 1201 Westlund Agreement.  Even though Geib introduced Tumbarello and Chambers, Geib did not testify that he had received any documents or information of any kind from the Debtor.  In short, the testimony of Tumbarello and Geib characterizing the relationship between the Plaintiffs and the Debtor as a joint venture or similar arrangement encompassing the activities and conduct of Chambers is both conclusory and speculative at best.  That testimony is entitled to little weight.

Under these circumstances, the court finds that the Plaintiffs have failed to demonstrate by a preponderance of the evidence that a joint venture or similar relationship existed between the Plaintiffs and the Debtor, or between the Debtor and Chambers, that encompassed the alleged conduct of Chambers.[45]  As a result, Plaintiffs have failed to demonstrate that any conduct by Chambers, including fraudulent conduct if any, can be imputed to the Debtor.  Plaintiffs' claim based on actual fraud within the meaning of Section 523(a)(2)(A) therefore fails.[46]

---

[45] For the same reason, the court concludes that the Plaintiffs have failed to demonstrate the existence of a fraudulent transfer scheme.  Sufficient evidence has not been presented that Chambers transferred to the Debtor any funds or property of the Plaintiffs.  In short, there is no persuasive evidence of a debt owed by the Debtor to the Plaintiffs that is traceable to the fraud committed by Chambers, if any.

[46] For some reason, Plaintiffs also maintain that the Debtor engaged in fraud by scheduling an interest in the 1207 Westlund property on her Schedule "A/B."  See Plaintiffs Closing Brief at 10:20 to 11:6.  Plaintiffs do not allege in their adversary complaint, however, that Debtor's listing of an interest in the property constitutes a false oath within the meaning of Section 727(a)(4)(A).  Likewise, Plaintiffs have never sought to bar the Debtor's discharge.  In fact, the Debtor already received her Chapter 7 discharge on April 13, 2021. Moreover, a post-petition fraudulent act likely would not be the basis for determining the dischargeability of a pre-petition claim.

**B.  Section 523(a)(4).**

As previously mentioned, Plaintiffs assert for the first time that the Debtor acted in a fiduciary capacity within the meaning of Section 523(a)(4).  Plaintiffs maintain that fiduciary duties arose because of the existence of a joint venture.  See Plaintiffs Closing Brief at 4:23 to 5:2, citing In re Zheng, 2022 Bankr.LEXIS 826, at *14-16 (Bankr. D. Nev. Mar. 25, 2022). Because Plaintiffs have failed to demonstrate that a joint venture or similar relationship existed between any of the parties, including between the Debtor and the Plaintiffs, they have failed to establish that the Debtor acted in a fiduciary capacity with respect to the Plaintiffs.[47]  For that reason, Plaintiffs' claim under Section 523(a)(4) also fails.[48]

**C.  Section 523(a)(6).**

Plaintiffs assert that the Debtor had a subjective motive to inflict injury or believed that injury was substantially certain to result.  They also assert that the Debtor committed wrongful acts that were intentional, and that necessarily caused injury to the Plaintiffs.  Of course, Plaintiffs also maintain that the Debtor had no just cause or excuse for engaging in such conduct.

Plaintiffs' legal theory, of course, assumes that they can establish that the Debtor had knowledge of the 1207 Westlund Agreement and the 1201 Westlund Agreement, of the obligations under both agreements, and of the conduct of Chambers.  No one disputes that Tumbarello never met the Debtor.  Neither Tumbarello nor Geib testified that they informed the Debtor of Chambers' activities or of any representations Chambers may have made in connection with the formation or performance of either agreement.  Without such knowledge, there is no evidence to infer the Debtor's subjective motive, nor her belief as to the occurrence of

---

[47] The court has concluded that there was no joint venture between Chambers and the Debtor for which any fraudulent conduct by Chambers, if any, can be imputed to the Debtor. Because there also is no joint venture between the Plaintiffs and the Debtor, there also is no technical trust giving rise to any fiduciary duties under Nevada law between the Plaintiffs and the Debtor.

[48] Moreover, Plaintiffs also have not demonstrated that the Debtor acted with knowledge of, or gross recklessness in respect to the improper nature of the relevant fiduciary behavior.  See Bullock v. BankChampaign, N.A., 569 U.S. 267, 269 (2013).  Because the Plaintiffs have failed to prove that a fiduciary relationship ever existed between themselves and the Debtor, they also failed to establish a defalcation within the meaning of Section 523(a)(4).

any injury to the Plaintiffs.  Thus, Plaintiffs have failed to establish that there is a debt resulting from a willful injury attributable to the Debtor.

There appears to be no dispute that the Debtor intentionally engaged in various acts. Having failed to demonstrate that the Debtor signed the agreements or otherwise entered into a joint venture with the Plaintiffs or with Chambers, however, Plaintiffs have not demonstrated that the Debtor knowingly committed any intentional acts that were wrongful.  In other words, because the Plaintiffs' claims are predicated almost entirely on the alleged misconduct of Chambers, if any, they have not attempted to provide direct or sufficient evidence that the Debtor's intentional acts were without just cause or excuse.  Under these circumstances, Plaintiffs' claim under Section 523(a)(6) also fails.

## CONCLUSION

For the reasons discussed, the court concludes that the Plaintiffs have failed to meet their burden of proof.  A separate judgment will be entered dismissing with prejudice Plaintiffs claims against the Debtor under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).

Copies sent via CM/ECF ELECTRONIC FILING

Copies sent via BNC to:
ELIZABETH ANN RAMSEY
1201 WESTLUND DRIVE
LAS VEGAS, NV 89102

# # #